**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KENNETH HASSON, individually and on behalf of all others similarly situated,<br><br>　　　Plaintiff,<br><br>v.<br><br>FULLSTORY, INC.,<br><br>　　　Defendant. | Case No. 2:22-cv-1246<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT - CLASS ACTION

Plaintiff Kenneth Hasson ("Plaintiff"), individually and on behalf of all others similarly situated, hereby files this class action complaint against Defendant FullStory, Inc. ("Defendant" or "FullStory") and in support thereof alleges the following:

## INTRODUCTION

1.　　This is a class action to combat insidious privacy intrusions resulting from the overzealous deployment of surveillance software on the internet.  Specifically, Plaintiff brings this class action against FullStory for wiretapping the electronic communications of visitors to various websites that use FullStory's session replay software. FullStory's wiretap is deployed through a snippet of JavaScript computer code embedded on the websites of FullStory's clients, which enables FullStory to secretly intercept and record website users' electronic communications, including website visitors' mouse movements, clicks, keystrokes, URLs of web pages visited, and/or other electronic communications in real-time ("Website Communications").

2.　　After intercepting and capturing the Website Communications, FullStory uses those Website Communications to recreate the website visitor's entire visit to the website

1

through what is known as session replay, which is available to FullStory and its clients. FullStory's conduct results in the electronic equivalent of "looking over the shoulder" of the website visitor for the entire duration of their website interaction.

3.    FullStory's conduct violates the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. § 5701, *et. seq.*, and constitutes an invasion of the privacy rights of website visitors.

4.    Plaintiff brings this action individually and on behalf of a class of all Pennsylvania citizens whose Website Communications were intercepted by FullStory and seeks all civil remedies provided under the causes of action, including but not limited to compensatory, statutory, and/or punitive damages, and attorneys' fees and costs.

## PARTIES

5.    Plaintiff Kenneth Hasson is a citizen of the Commonwealth of Pennsylvania, and at all times relevant to this action, resided and was domiciled in Lawrence County, Pennsylvania. Plaintiff is a citizen of Pennsylvania.

6.    Defendant FullStory is a corporation organized under the laws of Delaware, and its principal place of business is located at 1745 Peachtree Street Northwest, Suite G, Atlanta, Georgia 30309. Defendant is a citizen of Georgia and Delaware.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class, including Plaintiff, is a citizen of a state different than Defendant.

8.      This Court has personal jurisdiction over Defendant because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in the Commonwealth. The privacy violations complained of herein resulted from Defendant's purposeful and tortious acts directed towards citizens of Pennsylvania. At all relevant times, Defendant knew that its practices would directly result in collection of information from Pennsylvania citizens while those citizens browse websites. Defendant chose to avail itself of the business opportunity of collecting real-time data from website visitor sessions initiated by Pennsylvanians, and the claims alleged herein arise from those activities.

9.      Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

## FACTUAL ALLEGATIONS

**A.      Website User and Usage Data Have Immense Economic Value.**

10.      The "world's most valuable resource is no longer oil, but data."[1]

11.      Earlier this year, Business News Daily reported that many businesses now collect personal data (*i.e.*, gender, web browser cookies, IP addresses, and device IDs), engagement data (*i.e.*, how consumers interact with a business's website, applications, and emails), behavioral data (*i.e.*, customers' purchase histories and product usage information), and attitudinal data (*i.e.*, data on consumer satisfaction) from consumers.[2] This information is extremely valuable to

---

[1] *The world's most valuable resource is no longer oil, but data*, The Economist (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longeroil-but-data.
[2] Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, Business News Daily (Aug. 5, 2022), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html.

businesses because it can be used to improve customer experiences, refine marketing strategies, sold to other data users, and even to secure more sensitive consumer data.[3]

12.     In a consumer-driven world, the ability to capture and use customer data to shape products, solutions, and the buying experience is critically important to a business's success. Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[4]

13.     In 2013, the Organization for Economic Cooperation and Development ("OECD") even published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[5] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[6]

14.     OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e. $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55."[7]

---

[3] *Id.*
[4] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, *Capturing value from your customer data*, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.
[5] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, NO. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.
[6] *Id.* at 25
[7] *Id.*

**B.**     **Website Users Have a Reasonable Expectation of Privacy in Their Interactions with Websites.**

15.     Consumers are skeptical and wary about their data being collected. A report released by KPMG shows that "a full 86% of the respondents said they feel a growing concern about data privacy, while 78% expressed fears about the amount of data being collected."[8]

16.     Another recent paper also indicates that most website visitors will assume their detailed interactions with a website will only be used by the website and not be shared with a party they know nothing about.[9] As such, website visitors reasonably expect that their interactions with a website should not be released to third parties unless explicitly stated.[10]

17.     Privacy polls and studies show that a majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

18.     A recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[11]

---

[8] Lance Whitney, *Data privacy is a growing concern for more consumers*, TechRepublic (Aug. 17, 2021), https://www.techrepublic.com/article/data-privacy-is-a-growing-concern-for-more-consumers/.

[9] *CUJO AI Recent Survey Reveals U.S. Internet Users Expectations and Concerns Towards Privacy and Online Tracking*, CUJO (May 26, 2020), https://www.prnewswire.com/news-releases/cujo-ai-recent-survey-reveals-us-internet-users-expectations-and-concerns-towards-privacy-and-online-tracking-301064970.html.

[10] Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, The Information Society, 38:4, 257, 258 (2022).

[11] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, Consumer Reports (May 11, 2017),

19.     Moreover, according to a study by Pew Research Center, a majority of Americans, approximately 79%, are concerned about how data is collected about them by businesses.[12]

20.     Users act consistently with their expectation of privacy. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing businesses to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[13]

### C.     How Session Replay Scripts Work

21.     Session replay scripts, such as FullStory's, offer website operators the ability to record, save, and replay website visitors' interactions with a given website. They provide online marketers and website designers with insights into the user experience by recording website visitors "as they click, scroll, type or navigate across different web pages."[14]

22.     While session replay scripts are utilized by websites for some legitimate purposes, they go well beyond normal website analytics when it comes to collecting the actual contents of communications between website visitors and websites. Unlike other online advertising tools, session replay scripts can allow a website to capture and record nearly every action a website visitor takes while visiting the website, including actions that reveal the visitor's personal or

---

https://www.consumerreports.org/consumerreports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

[12] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, Pew Research Center, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-Confusedand-feeling-lack-of-control-over-their-personal-information/.

[13] Margaret Taylor, *How Apple screwed Facebook*, Wired, (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

[14] Erin Gilliam Haije, *[Updated] Are Session Recording Tools a Risk to Internet Privacy?*, Mopinion (Mar. 7, 2018), https://mopinion.com/are-session-recording-tools-a-risk-to-internet-privacy/.

private sensitive data, sometimes even when the visitor does not intend to submit the data to the website operator.[15] Further, website visitors "aren't just sharing data with the [web]site they're on . . . but also with an analytics service that may be watching over their shoulder."[16]

23.     Session replay software works by inserting code into the various event handling routines that Web browsers use to receive input from users, thus intercepting the occurrence of actions the user takes. When a website delivers session replay-enabling code to a user's browser, the browser will follow the code's instructions by sending responses in the form of "event" data to a designated third-party server. Typically, the server receiving the event data is controlled by the third-party entity that wrote the session-replay code, rather than the owner of the website where the code is installed.

24.     The types of events captured by session replay code vary by specific product and configuration, but in general are wide-ranging and can encompass virtually every user action, including all mouse movements, clicks, scrolls, zooms, window resizes, keystrokes, text entry, and numerous other forms of a user's navigation and interaction through the website. In order to permit a reconstruction of a user's visit accurately, the session replay-enabling code must be capable of capturing these events at hyper-frequent intervals, often just milliseconds apart. Events are typically accumulated and transmitted in blocks periodically throughout the user's website session.

25.     Unless specifically masked through configurations chosen by the website owner, some visible contents of the website may also be transmitted to the session replay code provider.

---

[15] *Id.*
[16] Eric Ravenscraft, *Almost Every Website You Visit Records Exactly How Your Mouse Moves*, Medium (Feb. 5, 2020), https://onezero.medium.com/almost-every-website-you-visit-records-exactly-how-your-mouse-moves-4134cb1cc7a0.

26.     Once the events from a user's session have been recorded by a session replay script, a website operator can view a visual reenactment of the user's visit through the session replay provider, usually in the form of a video, meaning "[u]nlike typical analytics services that provide aggregate statistics, these scripts are intended for the recording and playback of individual browsing sessions."[17]

27.     Because most session replay scripts will by default indiscriminately capture the maximum range of user-initiated events and content displayed by the website, researchers have found that a variety of highly sensitive information can be captured in event responses from website visitors, including medical conditions, credit card details, and other personal information displayed or entered on webpages.[18]

28.     Most alarming, session replay scripts may capture data that the user did not even intentionally transmit to a website during a visit, and then make that data available to website owners when they access the session replay service. For example, if a user writes information into a text form field, but then chooses not to click a "submit" or "enter" button on the website, the session replay script may nevertheless cause the non-submitted text to be sent to the designated event response receiving server before the user deletes the text or leaves the page. This information will then be viewable to the website owner when accessing the session replay service.

29.     Session replay scripts do not necessarily anonymize user sessions, either.

---

[17] Steven Englehardt, *No boundaries: Exfiltration of personal data by session-replay scripts*, Freedom to Tinker (Nov. 15, 2017), https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.
[18] *Id.*

30.     First, if a user's entry of personally identifying information is captured in an event response, that data will become known and visible to both the session replay service provider and the website owner.

31.     Second, if a website displays user account information to a logged-in user, that content may be captured by session replay script.

32.     Third, some providers, such as FullStory, explicitly offer website owners cookie functionality that permits linking a session to an identified user, who may be personally identified if the website owner has associated the user with an email address or username.[19]

33.     Session replay providers often create "fingerprints" that are unique to a particular user's combination of computer and browser settings, screen configuration, and other detectable information.

34.     The resulting fingerprint, which is often unique to a user and rarely changes, are collected across all sites that the third-party session replay provider monitors.

35.     When a user eventually identifies themselves to one of these websites (such as by filling in a form), the session replay provider can then associate the fingerprint with the user identity and can then back-reference all of that user's other web browsing across other websites previously visited, including on websites where the user had intended to remain anonymous— even if the user explicitly indicated that they would like to remain anonymous by enabling private browsing.

36.     In addition to the privacy invasions caused by the diversion of user communications with websites to third-party session replay providers, session replay scripts also

---

[19] *Id.*; *see also FS.identify – Identifying users*, FullStory, https://help.fullstory.com/hc/en-us/articles/360020828113, (last visited Aug. 29, 2022).

expose website visitors to identity theft, online scams, and other privacy threats.[20] Indeed, "[t]he more copies of sensitive information that exist, the broader the attack surface, and when data is being collected [ ] it may not be stored properly or have standard protections" increasing "the overall risk that data will someday publicly leak or be breached."[21]

37.     Recognizing the privacy concerns posed by session replay scripts, in 2019 Apple required app developers to remove or properly disclose the use of analytics code that allow app developers to record how a user interacts with their iPhone apps or face immediate removal from the app store.[22] In announcing this decision, Apple stated: "Protecting user privacy is paramount in the Apple ecosystem. Our App Store Review Guidelines require that apps request explicit user consent and provide a clear visual indication when recording, logging, or otherwise making a record of user activity."[23]

> **D.     FullStory Secretly Wiretaps Its Clients' Websites' Users.**

38.     FullStory is a web-based intelligence system company that develops marketing analytics software of the same name.

39.     Over 2 million websites in the United States use FullStory's software.[24]

40.     One of the features of FullStory's software is a session replay script, enabling a company who uses the software to record, reconstruct, and visually play back a web user's

---

[20] Juha Sarrinen, *Session Replay is a Major Threat to Privacy on the Web*, itnews (Nov. 16, 2017), https://www.itnews.com.au/news/session-replay-is-a-major-threat-to-privacy-on-the-web-477720.

[21] Lily Hay Newman, *Covert 'Replay Sessions' Have Been harvesting Passwords by Mistake*, WIRED (Feb. 26, 2018), https://www.wired.com/story/covert-replay-sessions-harvesting-passwords/.

[22] Zack Whittaker, *Apple Tells App Developers to Disclose or Remove Screen Recording Code*, TechCrunch (Feb. 7, 2019), https://techcrunch.com/2019/02/07/apple-glassbox-apps/.

[23] *Id.*

[24] *FullStory Usage Statistics*, BuiltWith, https://trends.builtwith.com/analytics/FullStory (last visited Aug. 29, 2022).

website session based on the information FullStory's software collects. Put another way, FullStory's session replay script "collects data pertaining to an individual's interactions with a website" and that data "can later be overlaid upon an image of the website to produce a video-like reproduction of a user's online experience."[25]

41.     As explained on FullStory's website, the software is implemented when a "small snippet" of JavaScript code is placed in the code of a client website (the "FullStory Script").[26] The FullStory Script is "super small" and "designed to be unnoticeable to any user of" a website.[27] Once a website installs the FullStory Script, that code acts as a secret wiretap that sends users' Website Communications to FullStory in real time, instantly reporting every keystroke, movement, click, and/or moment of inactivity to the FullStory server.

42.     The FullStory Script is embedded in a website by adding its JavaScript code into the HyperText Markup Language (HTML) underlying the website. As with all HTML code, the FullStory Script is not visible to a user who is navigating a webpage through a standard browser's default view, because by design a browser will interpret HTML, without showing it, in order to render a more user-friendly display that is the designer's intended presentation of the website to a visitor.

43.     The FullStory Script can be revealed to technical users who understand web technologies and can enable alternative display modes that will show underlying HTML, such as "developer tools," but even then, the users would first need to know what they are looking for in

---

[25] *Session Replay Scripts: A Guide for Privacy Professionals*, Future of Privacy Forum (February 2018), https://fpf.org/wp-content/uploads/2018/03/FPF-Guide-to-Session-Replay-Scripts.pdf.
[26] *The Definite Guide to Session Replay*, FullStory, https://www.fullstory.com/session-replay/, (last visited Aug. 29, 2022) (hereinafter "Session Replay Guide").
[27] *Installing the FullStory Script*, FullStory, https://help.fullstory.com/hc/en-us/articles/360020623514-Installing-the-FullStory-Script, (last visited Aug. 29, 2022).

order to find the script. Developer tools are intended for website programmers, and are generally not meaningful or comprehensible by those without a background in computer science.

44.     The FullStory Script deploys automatically, and the wiretapping commences immediately on the visitor's web browser when the visitor loads a website in their browser.

45.     The FullStory Script enables the identification of the specific user for each website session over time and across devices.[28]

46.     As these users are tracked, the FullStory Script records all of their actions, including information typed by the website users while on the website.  Such information can include names, emails, phone numbers, addresses, social security numbers, date of birth, and more; research by the Princeton University Center for Information Technology Policy found that "text typed into forms is collected before the user submits the form, and precise mouse movements are saved, all without any visual indication to the user."[29]

47.     The information the FullStory Script captures allows FullStory's clients to recreate website visitors' experience. "FullStory creates a pixel-perfect rendition[] of user journeys."[30] Thus, "FullStory recreates the view that [] users' see in their browsers by faithfully reconstructing all of the captured events exactly as they occurred during [ ] users' experience."[31]

---

[28] *Id.*; *see also FS.identify – Identifying users*, FullStory, https://help.fullstory.com/hc/en-us/articles/360020828113, (last visited Aug. 29, 2022).

[29] Englehardt, *supra* note 17.

[30] *How does FullStory capture data to recreate my users' experience?*, FullStory, https://help.fullstory.com/hc/en-us/articles/360032975773-How-does-FullStory-capture-data-to-recreate-my-users-experience-, (last visited Aug. 18, 2022) (hereinafter "FullStory Data Capture").

[31] *Id.*

48.     FullStory even allows clients to watch website users' activity on its app live, "co-brows[ing]" and "essentially . . . riding along in near real time with the user," as if looking over the user's shoulder as they browse on their computer.[32]

49.     When a user visits a website and the FullStory Script is activated, "it takes a snapshot of all the elements that are presented to the user . . . and starts a session bundle in the FullStory servers. Then FullStory observes (aka, waits and watches)."[33]

50.     As a user interacts with any website with the embedded FullStory Script, "each click, tap, URL visit, and every other interaction is sent in tiny little packets to that existing session at FullStory servers."[34] This includes button clicks, mouse movements, scrolling, resizing, touches (for mobile browsers), key presses, page navigation, changes to visual elements in the browsers, network requests, and more.[35]

51.     "As packets of interactions arrive at FullStory, each of the events (*i.e.*, click, tap, page visit) is 'tagged' to make them indexable in concert with other users' session information. Crucially these indexed events are available in aggregate with other user behavior, building and making searchable a library of [ ] customers' interactions."[36]

52.     The intimate user interactions collected by the FullStory Script is akin to observing a website user's digital body language without their knowledge.[37]

---

[32] Joel Webber, *Want to Co-Browse your customers in Real Time? Go Live With FullStory!*, FullStory Aug. 4, 2016), https://www.fullstory.com/blog/want-to-co-browse-with-your-customers-in-real-time-go-live-with-fullstory/.
[33] Steven Shyne, *Explained: Wait How Does FullStory Work?*, CXperts (Jul. 19, 2022), https://www.cxperts.io/post/how-does-fullstory-work
[34] *Id.*
[35] FullStory Data Capture, *supra* note 30.
[36] Shyne, *supra* not 33.
[37] Ravenscraft, *supra* note 16. ("What surprised me was that the [FullStory] software even recorded when I shook my mouse around while deciding what to click on. It felt like observing digital body language.").

53.     Finally, the FullStory Script "bundles a single user's session together so [clients] can understand a single user over several sessions to observe the things they did or did not do over time."[38]

54.     The FullStory Script enables FullStory and its clients to collect highly personal information. Notably, FullStory touts that it can tie what would be an anonymous website user to an individual, unique identity through the use of cookies. That user identity can be associated to a natural person with relative ease if the user either has an account with the website or enters any personally identifying information during any visit to the website.[39]

     **E.**     **FullStory Has a History of Violating Website Visitors' Privacy.**

55.     While FullStory claims it "requires users to block sensitive information from being recorded,"[40] it employs a fundamentally flawed automated redaction to ensure user privacy. Indeed, FullStory's fundamentally flawed redaction process has prompted some websites to stop sharing data with FullStory out of fear of privacy violations. For example, in 2017, researchers discovered Walgreens.com, which utilized FullStory, was leaking website visitors' medical conditions and prescriptions to FullStory.[41] Because user's names had been leaked earlier in website sessions, FullStory was able to link users' identities to the medicine that they were prescribed.[42]

---

[38] *Id.*

[39] *FS.identify – Identifying users*, FullStory, https://help.fullstory.com/hc/en-us/articles/360020828113, (last visited Aug. 29, 2022).

[40] Session Replay Guide, *supra* note 26.

[41] Katharine Schwab, *The Popular Design Tool That's Actually a Privacy Nightmare*, Fast Company (Nov. 28, 2017), https://www.fastcompany.com/90152433/the-popular-web-design-tool-thats-actually-a-massive-privacy-nightmare.

[42] *Id.*

56.     Importantly, this occurred despite Walgreens using additional manual redactions to keep website visitors' information private and its assurance: "Walgreens does not retain this data and cannot access or view your answers."[43]

57.     In response to the discovery, Walgreens stopped sharing data with FullStory "out of an abundance of caution."[44]

58.     Again in 2017, researchers also discovered that Bonobos.com, a men's clothing store which utilized FullStory was leaking full credit card information to FullStory—a website visitor's full credit card number, expiration date, CVV number, name, and billing address.[45]

59.     In response to the findings, Bonobos stopped working with FullStory, announcing "We eliminated data sharing with FullStory in order to evaluate our protocols and operations with respect to their service. We are continually assessing and strengthening systems and processes in order to protect our customers' data."[46]

60.     In 2018, researchers further discovered that Gradescope, a website used for grading assignments also utilized FullStory.[47] Researchers found that student names and emails, grades, and instructor comments were being sent to FullStory's servers.[48] The researchers concluded that such a disclosure was a violation of U.S. educational privacy law.[49]

---

[43] Nitasha Tiku, *The Dark Side of 'Replay Sessions' That Record Your Every Move Online*, WIRED (Nov. 16, 2017), https://www.wired.com/story/the-dark-side-of-replay-sessions-that-record-your-every-move-online/.
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] Steven Englehardt, Gunes Acar, & Arvind Narayanan, *Website Operators are in the Dark About Privacy Violations by Third-Party Scripts*, Freedom to Tinker (Jan. 12, 2018), https://freedom-to-tinker.com/2018/01/12/website-operators-are-in-the-dark-about-privacy-violations-by-third-party-scripts/.
[48] *Id.*
[49] *Id.*

61.     Gradescope removed FullStory from its website within hours of being notified of the results.[50]

62.     Most recently, a writer for Medium did his own investigation of FullStory by installing FullStory Script on his personal portfolio site. When he added a basic text field labeled "password," FullStory Script was able to see any text entered into the box, even if it was never submitted.[51]

## F.     Plaintiff's and Class Members' Experiences.

63.     Plaintiff visited www.mattressfirm.com on his computer from inside the Commonwealth of Pennsylvania.

64.     While visiting www.mattressfirm.com, Plaintiff fell victim to FullStory's unlawful monitoring, recording, and collections of Plaintiff's Website Communications with the website.

65.     Unknown to Plaintiff, the FullStory Script was embedded on the website.

66.     During the website visit, Plaintiff's Website Communications were captured by the FullStory Script and sent to FullStory.

67.     For example, when visiting www.mattressfirm.com, if a website user adds an item to their cart, that information is captured by FullStory:

---

[50] *Id.*
[51] Ravenscraft, *supra* note 16.



*Depicting information sent to FullStory after adding the "Serta Perfect Sleeper Charlotte 11.5" Medium Plush Mattress" to the user's cart while visiting www.mattressfirm.com.*

68.     Similarly, when visiting www.mattressfirm.com, if a user enters personal information in a dialogue box offering "live chat" help, that information would be sent to FullStory:



*Depicting information sent to FullStory after entering an email address (purple text) to a live chat window on a website containing FullStory Script.*



*Depicting information sent to FullStory after entering a phone number (purple text) to a live chat window on a website containing FullStory Script.*

69.    FullStory's wiretapping is ongoing during the visit and operates through hyper-frequently instantaneous transmissions, as illustrated below, in which only 53 milliseconds were required to send a packet of event response data, which would indicate whatever the user had just done on the website:



70.    While visiting www.mattressfirm.com, Plaintiff engaged in communications with the website's owner, including by browsing products, clicking through numerous pages, adding a product into his cart, and entering his personal information (including name, address, email address, and payment information) into form fields.

71.    FullStory intercepted the contents of these communications and instantaneously received the same information communicated between Plaintiff and the website's owner.

72.    The FullStory Script operates in the same manner for all putative class members, across thousands of websites.

73. Like Plaintiff, each class member visited a website with the FullStory Script embedded in it, and the FullStory Script intercepted the class members' Website Communications with those websites.

74. Even if a given website owner masks certain content when it configures the settings of FullStory's Script for a specific webpage, any operational iteration of FullStory's session replay script will, by its very nature and purpose, intercept the contents of communications between the website's visitors and the website owner.

**CLASS ACTION ALLEGATIONS**

75. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

> All natural persons in the Commonwealth of Pennsylvania whose Website Communications were captured in Pennsylvania through the use of FullStory software.

76. Excluded from the class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, all persons who make a timely election to be excluded from the class, the judge to whom this case is assigned and any immediate family members thereof, and the attorneys who enter their appearance in this action.

77. **Numerosity:** The members of the Class are so numerous that individual joinder of all Class members is impracticable. The precise number of class members and their identities may be obtained from the books and records of FullStory.

78. **Common Questions**: The Class's claims present common questions of law and fact. Common questions for the Class include, but are not limited to: (a) whether Defendant invaded website users' privacy by intercepting their Website Communications; (b) whether FullStory's acquisition of the contents of website user's Website Communications occurred

contemporaneously with their making; (c)  whether Defendant acquired the contents of website users' Website Communications without their consent; (d) whether Defendant violated Pennsylvania Wiretap Act,18 Pa. Cons. Stat. § 5701, *et seq*.; (e) whether Plaintiff and the Class members are entitled to equitable relief; and (f) whether Plaintiff and the Class members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

79.    **Typicality:** Plaintiff's claims are typical of the other class members' claims because, among other things, all class members were comparably injured through the uniform prohibited conduct described above. For instance, Plaintiff and each member of the class had their communications intercepted in violation of the law and their right to privacy. This uniform injury and the legal theories that underpin recovery make the claims of Plaintiff and the members of the class typical of one another.

80.    **Adequate Representation**: Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiff has no interest that is antagonistic to the interests of the Class, and Defendant has no defenses unique to any Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor his counsel have any interest adverse to the interests of the other members of the Class.

81.    **Superiority**: This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of

single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

82.     **Predominance:** Common questions of law and fact predominate over any questions affecting only individual class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant intercepted Plaintiff's and Class members' Website Communications, then Plaintiff and each Class member suffered damages by that conduct.

83.     **Ascertainability**: Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class members may be readily identified through FullStory's books and records.

84.     Plaintiff reserves the right to revise the foregoing class allegations and definition based on facts learned and legal developments following additional investigation, discovery, or otherwise.

<u>**COUNT I**</u>
**Violation of Pennsylvania Wiretap Act**
**18  Pa. Cons. Stat. § 5701, et. seq.**

85.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

86.     Plaintiff brings this claim individually and on behalf of the class.

87.     The Pennsylvania Wiretap Act ("WESCA") prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic,

or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. 18 Pa. Cons. Stat. § 5703.

88.     Any person who intercepts, discloses, or uses or who procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of WESCA is subject to a civil action for (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

89.     "Intercept" is defined as any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702.

90.     "Contents" is defined as "used with respect to any wire, electronic or oral communication, is any information concerning the substance, purport, or meaning of that communication." 18 Pa. Cons. Stat. § 5702.

91.     "Person" is defined as "any individual, partnership, association, joint stock company, trust or corporation." 18 Pa. Cons. Stat. § 5702.

92.     "Electronic Communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." 18 Pa. Cons. Stat. § 5702.

93.     FullStory is a person for purposes of WESCA because it is a corporation.

94.     The FullStory Script is a "device" used for the "acquisition of the contents of any wire, electronic, or oral communication" within the meaning of the WESCA.

95.     Plaintiff's and Class members' intercepted Website Communications constitute the "contents" of "electronic communication[s]" within the meaning of WESCA.

96.     Plaintiff's and Class members' electronic communications were intercepted contemporaneously with their transmission.

97.     Plaintiff and Class members did not consent to having their Website Communications wiretapped.

98.     FullStory intentionally intercepted or endeavored to intercept Plaintiff's and Class members' Website Communications; intentionally disclosed or endeavored to disclose the contents of Plaintiff's and Class members' Website Communications obtained through a wiretap; and/or intentionally used or endeavored to use the contents of Plaintiff's and Class members' Website Communications obtained through a wiretap.

99.     Pursuant to 18 Pa. Cons. Stat. 5725(a), Plaintiff and the Class members seek (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.

100.    FullStory's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class members any time they visit a website with FullStory's session replay script enabled without their consent. Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## COUNT II
### Invasion of Privacy – Intrusion Upon Seclusion

101.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

102.    Pennsylvania common law recognizes the tort of invasion of privacy. The right to privacy is also embodied in multiple sections of the Pennsylvania constitution.

103.    Plaintiff brings this claim individually and on behalf of the class.

104.    Plaintiff and Class members had an objective, reasonable expectation of privacy in their Website Communications.

105.    Plaintiff and Class members did not consent to, authorize, or know about FullStory's intrusion at the time it occurred. Plaintiff and Class members never agreed that FullStory could collect or disclose their electronic communications.

106.    Plaintiff and Class members had an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

107.    FullStory intentionally intruded on Plaintiff's and Class members' private life, seclusion, or solitude, without consent.

108.    FullStory's conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

109.    Plaintiff and Class members were harmed by FullStory's wrongful conduct as FullStory's conduct has caused Plaintiff and the Class mental anguish and suffering arising from their loss of privacy and confidentiality of their electronic communications.

110.    FullStory's conduct has needlessly harmed the Plaintiff and the Class by capturing intimately personal facts and data in the form of their electronic communications. This disclosure and loss of privacy and confidentiality has caused Plaintiff and the Class to experience mental anguish, emotional distress, worry, fear, and other harms.

111.    Additionally, given the monetary value of individual personal information, Defendant deprived Plaintiff and Class members of the economic value of their interactions with

Defendant's website, without providing proper consideration for Plaintiff's and Class members' property.

112.    Further, FullStory has improperly profited from its invasion of Plaintiff and Class members' privacy in its use of their data for its economic value.

113.    As a direct and proximate result FullStory's conduct, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

114.    FullStory's conduct is ongoing, and it continues to invade the privacy of Plaintiff and Class members any time they visit a website with FullStory's session replay script enabled without their consent. Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent future invasions of privacy.

## REQUEST FOR RELIEF

Plaintiff, individually and on behalf of the other members of the proposed Class, respectfully request that the Court enter judgment in Plaintiff's and the Class's favor and against Defendant as follows:

A.    Certifying the Class and appointing Plaintiff as the Class representative;

B.    Appointing Plaintiff's counsel as class counsel;

C.    Declaring that Defendant's past conduct was unlawful, as alleged herein;

D.    Declaring Defendant's ongoing conduct is unlawful, as alleged herein;

E.    Enjoining Defendant from continuing the unlawful practices described herein, and awarding such injunctive and other equitable relief as the Court deems just and proper;

F.      Awarding Plaintiff and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

G.      Awarding Plaintiff and the Class members pre-judgment and post-judgment interest;

H.      Awarding Plaintiff and the Class members reasonable attorneys' fees, costs, and expenses; and

I.      Granting such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and the Class, demands a trial by jury of any and all issues in this action so triable of right.

Dated: August 30, 2022                    Respectfully submitted,

*/s/ Gary F. Lynch*
Gary F. Lynch
Kelly K. Iverson
Jamisen A. Etzel
Elizabeth Pollock-Avery
Nicholas A. Colella
Patrick D. Donathen
**LYNCH CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, Pennsylvania 15222
Telephone: 412-322-9243
Facsimile: 412-231-0246
gary@lcllp.com
kelly@lcllp.com
jamisen@lcllp.com
elizabeth@lcllp.com
nickc@lcllp.com
patrick@lcllp.com

*Attorneys for Plaintiff*
*and the Proposed Class*